# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ) <br> CHICKOIYAH MILLER AND CATHY ) <br> SILLMAN, RELATORS, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> WESTON EDUCATIONAL, INC., d/b/a ) <br> HERITAGE COLLEGE, ) <br> ) <br> Defendant. ) | No. 4:11-CV-00112-NKL |

## ORDER

Plaintiffs Chickoiyah Miller and Cathy Sillman ("Relators") brought this *qui tam*
action under the False Claims Act ("FCA"), 31 U.S.C. § 3729, on behalf of the United
States against Weston Educational, Inc., d/b/a Heritage College ("Heritage"). Before the
Court is Heritage's motion to dismiss for failure to state a claim and, alternatively, for
failure to plead with sufficient particularity [Doc. # 22]. For the reasons set forth below,
Heritage's motion is DENIED.

## I.    Background

Heritage is a post-secondary, for-profit school with campuses in Kansas City,
Missouri, as well as several other states. Pursuant to Title IV of the Higher Education
Act of 1965 ("HEA"), 20 U.S.C. §§ 1070, *et seq.*, the federal government provides
financial aid to post-secondary students, including those at proprietary schools, in the

1

form of grants, loans, and other assistance. The students use these funds to pay their tuition and other educational expenses. To participate in Title IV programs, an institution must submit an application establishing its eligibility. If this is granted, the institution and its students then submit additional applications for specific disbursements of federal financial aid. At all times relevant to this case, Heritage was eligible to participate and did participate in these Title IV financial aid programs. Each time Heritage submitted or caused one of its students to submit a claim for federal financial aid, Heritage certified that it was an institution eligible to receive those funds.

To establish and maintain eligibility to participate in Title IV, Heritage had to fulfill numerous requirements. Among other things, Heritage had to be accredited by a nationally recognized accrediting agency and licensed to operate in Missouri. In addition, Heritage had to enter into a program participation agreement ("PPA") with the Secretary of Education ("Secretary"). The PPA states, "The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program." In the PPA, Heritage acknowledged that it "understands and agrees that it is subject to and will comply with the program statutes and implementing regulations."

Relators filed a five count complaint against Heritage. Under Count I, Relators claim that Heritage is liable under the FCA for fraudulent representations made in order to secure Title IV financial aid funds. Relators allege that Heritage defrauded the government into making Title IV payments by falsely representing its compliance and intention to comply with the applicable statutes and regulations. More specifically,

2

Relators allege that Heritage: 1) falsified student attendance records; 2) falsified student grades; 3) misappropriated student financial aid money; 4) enrolled and retained ineligible students; 5) falsified graduate employment placement records; 6) fabricated instructor evaluations; 7) unlawfully incentivized employees to retain students to maximize Title IV disbursements; and 8) employed unqualified teachers. Relators also claim that Heritage is liable under the FCA for continuously certifying its eligibility to receive Title IV funds while knowingly and intentionally violating the conditions of institutional eligibility.

In Counts II and III, Relators Miller and Sillman each seek relief under 31 U.S.C. § 3730(h), which provides a statutory remedy if an employer retaliates against an employee because of the employee's efforts to pursue an FCA action or prevent an FCA violation. In Counts IV and V, Relators Miller and Sillman each seek relief for wrongful termination under Missouri's public policy exception to the at-will employment doctrine.

## II.   Discussion

Heritage moves to dismiss Relators' Amended Complaint for failure to state a claim and, alternatively, for failure to plead with the particularity required by Federal Rule of Civil Procedure ("FRCP") 9(b). Under FRCP 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." In addition, a complaint that alleges fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The complaint does not have to present "detailed factual allegations," but it "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

3

662, 678 (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. When considering a motion to dismiss, the Court must accept as true the factual allegations contained in the complaint, and draw all reasonable inferences from those allegations in favor of the plaintiff. *See Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012).

A. **The Amended Complaint States a Claim Under the FCA**

Heritage argues that the Amended Complaint should be dismissed because the regulatory violations alleged in the Amended Complaint cannot give rise to FCA liability. The FCA establishes liability for any person who: 1) knowingly presents, or causes to be presented, a fraudulent claim for payment by the federal government; or 2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a fraudulent claim. 31 U.S.C. § 3729(a)(1)(A)-(B). This broad language reflects the fact that the FCA "was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). While the FCA is thus capable of adapting to reach new kinds of fraud, an FCA complaint must still, at its most basic, "show that a claim for payment from the government was made and that the claim was 'false or fraudulent.' " *United States ex rel. Rabushka v. Crane Co.*, 122 F.3d 559, 563 (8th Cir. 1997).

As a result, regulatory noncompliance may give rise to FCA liability, but only if the noncompliance at issue was material to the government's payment decision. *See United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 796 (8th Cir. 2011). Because

4

FCA liability attaches "not to the underlying fraudulent activity, but to the claim for payment," *United States ex rel. Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998) (quotation omitted), the FCA "requires a causal link between the 'false statement or record' and the government's payment of a false claim." *Vigil*, 639 F.3d 791, 799. As such, "only those actions by the claimant which have the purpose and effect of causing the United States to pay out money . . . are properly considered 'claims' within the meaning of the FCA." *Costner*, 153 F.3d at 677. In other words, the alleged fraud must be "material" to the government's payment decision. *Vigil*, 639 F.3d at 796. Consequently, not every regulatory violation gives rise to FCA liability, because not every regulatory violation is material to the government's payment decision. *Id.* at 799; *see also Mikes v. Straus*, 274 F.3d 687, 697 (2nd Cir. 2001) (noting that the FCA "does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions."). "Without sufficient allegations of materially false claims, an FCA complaint fails to state a claim on which relief may be granted." *Vigil*, 639 F.3d at 796.

Relators advance several alternative theories of FCA liability and Heritage contests all of them. Each of these theories is addressed in turn, below.

1.      **Relators' False Certification of Eligibility Theory Does Not State a Claim Under the FCA**

Under *Vigil*, Relators' claim that Heritage fraudulently certified its eligibility to receive Title IV funds fails as a matter of law. In *Vigil*, a relator brought an FCA claim against a private lender that participated in the Federal Family Education Loan Program

("FFELP") of the HEA. *Vigil*, 639 F.3d at 794. The relator alleged that the lender's violations of FFELP statutes and regulations rendered its claims for interest subsidies, special allowances, and insurance payments on defaulted loans fraudulent, giving rise to FCA liability. *Id.* at 794-95. The particular statute and regulations at issue provided for the disqualification, after notice and opportunity for a hearing, of otherwise eligible lenders that engaged in prohibited marketing practices and inducement schemes. *Id.* at 795. With limited exceptions, however, termination proceedings under these provisions did not affect a lender's claims for payments that were based on its prior participation in the program. *Id.*

The *Vigil* court first affirmed the dismissal of the relator's complaint in so far as it was based on the lender's allegedly fraudulent certification that it was an eligible lender. *Id.* at 796-97. The court noted that, under the FFELP, once a lender was deemed eligible, the lender retained eligibility until the Secretary terminated its participation in the program. *Id.* at 796. Consequently, the court agreed with the district court's ruling that "[a]bsent an allegation that [the lender] was stripped of its status as an eligible lender . . . [the lender's] certification that it was an eligible lender was not false or fraudulent." *Id.* at 796-97. Put differently, the allegation that the lender should not have been eligible to participate in the FFELP did not render the lender's certification of its eligibility fraudulent where the lender was, in fact, eligible.

The Amended Complaint presents an analogous claim where it is premised on the theory that Heritage fraudulently certified or represented its Title IV eligibility. According to the Amended Complaint, at all relevant times the Department of Education

6

("DOE") considered Heritage eligible to receive Title IV funds. *See, e.g.*, [Doc. # 8 at 7]. Relators argue that Heritage nonetheless falsely represented its eligibility because Heritage knew that it should not have been eligible. In particular, Relators maintain that Heritage should not have been accredited or authorized to operate in Missouri because Heritage did not meet the requirements attendant to each of these qualifications. Relators attempt to distinguish this case from *Vigil* on the ground that the Title IV regulations at issue here provide for the automatic termination of eligibility when an institution loses accreditation or state authorization.

Under the reasoning in *Vigil*, however, Relators' claim is too attenuated to support FCA liability. It is true that an institution's Title IV eligibility terminates on the date that it is no longer accredited or authorized to operate in the state in which it is physically located. 34 C.F.R. §§ 600.40(a)(1)(i), 600.5(a). But Relators do not allege that Heritage ever lost its accreditation or license to operate in Missouri. Rather, Relators contend that Heritage should not have been accredited or licensed in Missouri and thus should have lost its Title IV eligibility. This theory is nearly identical to the one rejected in *Vigil*. *See Vigil*, 639 F.3d at 796-97. Regardless of whether Heritage should have been accredited and licensed in Missouri, the fact remains that it did possess each of these qualifications. Absent an allegation that Heritage actually lost its accreditation or Missouri operating license, Relators cannot claim that Heritage's Title IV eligibility ever terminated. As such, any certification Heritage made regarding its eligibility could not have been false or fraudulent. *See id.* Consequently, the Amended Complaint fails to state a claim in so far as it is based on Heritage's certification of its eligibility to receive Title IV funds.

7

### 2.    Relators' Claim that Heritage Defrauded the Government in Entering the PPA States a Claim Under the FCA

Relators claim that Heritage defrauded the government in entering the PPA because Heritage did not intend to comply with the PPA at the time it executed this agreement. *See, e.g.*, [Doc. # 8 at 12]. A promise made with a simultaneous intent not to perform is, of course, fraud. *See, e.g.*, *Ritchie Capital Mgmt., LLC v. Jeffries*, 653 F.3d 755, 764 (8th Cir. 2011). Furthermore, execution of the PPA is an absolute prerequisite to initial or continued participation in any Title IV program. [Doc. # 22-1 at 3]. Absent the allegedly fraudulent statements made in the PPA, then, Heritage would not have been eligible to receive any funds under Title IV. As the Seventh Circuit explained in *United States ex rel. Main v. Oakland City University*, 426 F.3d 914 (7th Cir. 2005), this type of fraud in the PPA can give rise to FCA liability:

> The University 'uses' its phase-one application [which includes the PPA] (and the resulting certification of eligibility) when it makes (or 'causes' a student to make or use) a phase-two application for payment. . . . [I]f the University knew about the rule [in the PPA] and told the [DOE] that it would comply, while planning to do otherwise, it is exposed to penalties under the False Claims Act.

*Main*, 426 F.3d at 917. Heritage argues that *Main* is inapposite because *Vigil* controls. But this case is distinguishable from *Vigil* because the relator in *Vigil* did not "allege that [the lender] submitted a fraudulent application to establish its initial eligibility." *Vigil*, 639 F.3d at 797. In addition, under Relators' theory, all of Heritage's claims for Title IV payments were false because of Heritage's fraud in its initial application, which further distinguishes this case from *Vigil*. *Cf. id.* at 798 ("[The complaint] fails to plausibly

allege that the alleged regulatory noncompliance rendered all claims false or fraudulent.").

Furthermore, contrary to Heritage's contention, the Amended Complaint contains sufficient factual matter to survive the motion to dismiss. Heritage is correct that most of the specific instances of noncompliance described in the Amended Complaint occurred after Heritage's most recent renewal of its PPA in early 2009. But the Amended Complaint repeatedly alleges that Heritage's intentional and systemic noncompliance dates back to at least 2006. *See, e.g.*, [Doc. # 8 at 12, 20, 22]. The Amended Complaint also claims that Relator Miller began working at Heritage in July 2006 and that she has personal knowledge of Heritage's fraudulent practices. [Doc. # 8 at 2-3]. In addition, the Amended Complaint contains several representative examples of Heritage's alleged misconduct that predate the 2009 PPA. [Doc. # 8 at 22-23, 35-36, 46, 49].

The alleged misconduct that predates the PPA coupled with the systemic and deliberate violations from 2009 onward at least permit the inference that Heritage did not intend to comply with the PPA at the time it executed this agreement. Moreover, while the specific misconduct in a fraud case must be stated with particularity under FRCP 9(b), "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *Jeffries*, 653 F.3d at 764. Here, the Amended Complaint describes a widespread pattern of violations, some predating and most postdating the execution of the PPA, and makes the general allegation that Heritage knowingly and intentionally violated the conditions it agreed to comply with in the PPA. This is sufficient to draw the inference that Heritage never intended to comply with the

9

PPA and thus defrauded the government in entering the agreement. This conclusion is not affected by Heritage's contention that the PPA is not a certification of current or past compliance but rather a statement of present intent to comply in the future. It is the very lack of intent to comply in the future that is the basis for Relators' claim.

### 3. Relators' Claim that Ongoing Compliance with the PPA Was Material to the Government's Payment Decision Supports FCA Liability

Relators also present an alternative theory of liability, premised on the claim that ongoing compliance with the PPA is material to the government's decision to make Title IV payments. In other words, Relators contend that the government would not have made any Title IV payments to Heritage if it had been aware of Heritage's intentional violations of the PPA. Heritage responds that the regulatory violations described in the Amended Complaint concern only technical requirements associated with the administration of Title IV funds, making the alleged violations immaterial to the government's payment decision.

Regarding materiality, Heritage cannot claim that *Vigil* stands for the proposition that compliance with the PPA is not material to the government's decision to pay Title IV claims, for the simple reason that this issue was not before the court. *Vigil* concerned a lender's claims for payments under the FFELP. In this context, the court found that the complaint did not plausibly allege that the regulatory violations described therein were material to the government's payment decision. *Vigil*, 639 F.3d at 799-800. By contrast, several courts have found noncompliance with certain parts of the PPA material to the government's decision to disburse Title IV funds. *See, e.g.*, *United States ex rel. Hendow*

10

*v. Univ. of Phoenix*, 461 F.3d 1166, 1176-77 (9th Cir. 2006); *Main*, 426 F.3d at 916 (7th Cir. 2005); *United States v. Educ. Mgmt. Corp.*, No. 07-CV-461, 2012 WL 1658482, at *19-20 (W.D. Pa. May 11, 2012).

Whether or not the particular noncompliance alleged in the Amended Complaint was material to the government's payment decision may depend on whether Heritage violated conditions of payment or conditions of participation. As the Eighth Circuit recently explained:

> [T]he fact-intensive issue of whether a specific type of regulatory non-compliance resulted in a materially false claim for a specific government payment . . . is often complex and may require inquiry into whether a regulatory requirement was a precondition to the government payment or merely a condition of continuing participation in a government program.

*United States ex rel. Onnen v. Sioux Falls Independent School District*, 688 F.3d 410, 414-15 (8th Cir. 2012). In the context of Medicare claims, at least, some courts have distinguished between conditions of payment and conditions of participation when evaluating FCA claims. *See, e.g.*, *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 306-311 (3d Cir. 2011); *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008). Heritage urges the Court to apply the conditions of payment versus conditions of participation framework and find that the Amended Complaint is deficient because it alleges only violations of conditions of participation.

Relators, and the United States as the real party in interest, argue that, in the context of Title IV payments made to educational institutions, the distinction between conditions of payment and conditions of participation "is a distinction without

11

difference." *Hendow*, 461 F.3d at 1176.  During the oral argument in *Onnen*, Judge

Loken noted that "[i]t would be very difficult" to devise a unified theory of materiality

for FCA cases, and thus the issue must be resolved "case by case."  [Doc. # 46-2 at 2].

This suggests that materiality does not singularly or universally depend on whether or not

compliance with a given regulation is characterized as a condition of payment.  While the

conditions of payment versus participation framework *may* be useful in some contexts,

such as Medicare, it is not necessarily dispositive in every case.  *See Onnen*, 688 F.3d at

414-15 (noting that the materiality determination "*may* require" analysis of whether

regulatory compliance was a condition of payment or a condition of participation

(emphasis added)); *see also Main*, 426 F.3d at 916 ("If a false statement is integral to the

causal chain leading to payment, it is irrelevant how the federal bureaucracy has

apportioned the statements among layers of paperwork.").

Even applying the conditions of payment standard, however, it is plausible that

Heritage's noncompliance with the PPA, as alleged in the Amended Complaint, violated

conditions of payment.  Heritage attempts to draw a distinction between the regulations

regarding eligibility, 34 C.F.R. § 600 *et seq.*, and the regulations applicable to the

administration of Title IV funds, 34 C.F.R. § 668 *et seq*.  Heritage states that only the

former are conditions of payment, whereas the latter are conditions of participation.  But

the PPA does not make this distinction.  [Doc. # 22-1 at 4] ("The Institution understands

and agrees that it is subject to and will comply with the program statutes and

implementing regulations for institutional eligibility as set forth in 34 CFR Part 600 . . .

12

as well as . . . [the] regulations set forth in 34 CFR Part 668.").  Furthermore, Heritage

does not cite any authority to support its interpretation of these regulations.

By contrast, the Ninth Circuit, in deciding this very issue, discussed at length why

the PPA is both a condition of payment and a condition of participation:

> In the context of Title IV and the Higher Education Act, if we held that
> conditions of participation were not conditions of payment, there would be
> no conditions of payment at all—and thus, an educational institution could
> flout the law at will. . . .  For purposes of federal funding, the University is
> not permitted to merely have a history of compliance with the applicable
> regulations; it must also agree to comply in the future.  The Program
> Participation Agreement, constraining its ongoing conduct, is the condition
> of payment that the federal government requires—a promise that the
> University shall not break the law, not merely an assertion that it has not
> broken the law *yet*.  If such promises were not conditions of payment, the
> University would be virtually unfettered in its ability to receive funds from
> the government while flouting the law.  This cannot be what Congress and
> the DOE intend when they ask institutions to sign Program Participation
> Agreements.

*Hendow*, 461 F.3d at 1176-77.  The *Hendow* court described the promises in the PPA as " 

'the *sine qua non*' of federal funding, for one basic reason:  if the University had not

agreed to comply with them, it would not have gotten paid."  *Id.* at 1176.  Put simply,

execution of the PPA would be a meaningless gesture if compliance with its terms was

never material to the government's payment decision.  Consequently, Heritage has not

shown, as a matter of law, that noncompliance with the regulations contained in the PPA

can never be material to the government's decision to disburse Title IV funds.

Turning to the particular claims in the Amended Complaint, it is plausible that the

alleged noncompliance was material to the government's payment decisions.  For

instance, Relators claim that Heritage falsified attendance records so that it could keep

one hundred percent of the aid disbursed under Title IV, as opposed to refunding certain amounts as required by statute, regulation, and the PPA. [Doc. # 8 at 16-25]. Heritage thus purportedly "used" its false attendance records to claim payments to which it was not entitled. In other words, the Amended Complaint alleges that Heritage fraudulently promised to comply with the refund provisions and then used this misrepresentation to misappropriate payments made by the federal government. It is hard to imagine that the government's decision to make a Title IV payment would be unaffected by an institution's intentional practice of embezzling unearned financial aid. The Amended Complaint also claims that Heritage violated the incentive compensation ban, which other courts have found sufficiently material to give rise to FCA liability. *See, e.g.*, *Hendow*, 461 F.3d at 1176-77; *Main*, 426 F.3d at 916; *Educ. Mgmt. Corp.*, 2012 WL 1658482, at *19.

Heritage also argues that the Amended Complaint fails to state a claim under the FCA because Heritage did not certify its compliance with these provisions when it made specific requests for Title IV payments. As such, Heritage maintains that the Amended Complaint is deficient because it does not describe a single false statement that was actually presented to the government in the context of drawing down Title IV funds. Relators respond that the government materially relied on the promises in the PPA each time it made a Title IV payment to Heritage. Consequently, Relators claim, Heritage's intentional violations of the PPA made each claim for Title IV funds fraudulent. This theory of FCA liability is often referred to as implied false certification.

14

An implied false certification occurs when a party expressly agreed to comply with a statute or regulation and that obligation is implicated when the party submits a claim for payment, even though express certification of compliance is not required for each individual claim. *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). Citing *Vigil*, Heritage argues that the Eighth Circuit all but rejected this theory of FCA liability. But *Vigil* dealt with a claim based on express certification. In that case, the relator attached to the complaint blank "Certification" forms that the lender submitted when requesting payment. *Vigil*, 639 F.3d at 797. The relator argued that every submission of one of these certifications constituted a false claim. *Id.* The court rejected this claim, in part because the certification did not affirmatively declare that the lender had fully complied with all FFELP statutes and regulations. *Id.* at 798. In fact, there was no indication in *Vigil* that the lender *ever* expressly agreed to comply with the regulations at issue. In addition, each of the allegedly false certifications in *Vigil* "was specific to the loan or loans referenced in the [individual request for payment]." *Id.* at 797-98. Implied false certification was simply not an issue in that case.

By contrast, the PPA governs each and every request for payment submitted by Heritage. Execution of the PPA, and thus the express promise to comply with the applicable statutes and regulations, is an absolute prerequisite to initial or continued participation in any Title IV program. [Doc. # 22-1 at 3]. In addition, Title IV eligibility automatically terminates when the PPA expires. 34 C.F.R. § 600.10(d)(1). From these facts, it is reasonable to infer that the government paid Heritage based on the assumption

that Heritage was fulfilling, or at least not intentionally violating, the promises made in the PPA.

Furthermore, although the Eighth Circuit has apparently not addressed this theory of liability, the Second, Third, Sixth, Ninth, Tenth, Eleventh, and the District of Columbia Circuits have recognized implied certification liability under the FCA. *Mikes v. Straus*, 274 F.3d 687, 699-700 (2nd Cir. 2001); *Wilkins*, 659 F.3d at 306; *United States ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409, 415 (6th Cir. 2002); *Ebeid*, 616 F.3d at 996-98; *Conner*, 543 F.3d at 1217-18; *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005); *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010). At the same time, however, several of these courts also cautioned that this theory "should not be applied expansively." *See, e.g.*, *Wilkins*, 659 F.3d at 307.

But the substantial policy concerns that arise in the context of proprietary schools receiving Title IV funds suggest that this theory of liability may be particularly warranted in this context. "[F]or-profits possess unique characteristics that arguably divorce their productivity from their incentives, potentially encouraging behavior that runs afoul of the HEA." *United States v. ITT Educ. Servs., Inc.*, No. 1:07-cv-0867-TWP-MJD, 2012 WL 266943, at *2 (S.D. Ind. Jan. 30, 2012). These unique characteristics raise real concerns for protecting the federal fisc.

> The underlying concern here is that institutions, motivated by profit rather than a legitimate educational purpose, will recruit unqualified students who will then find themselves unable to repay these loans, causing a significant loss to the U.S. government which: 1) pays the funds directly to the

schools on behalf of the students; or 2) guarantees other loans and thus is
liable in the event of default.

*United States ex rel. Lopez v. Strayer Educ., Inc.*, 698 F. Supp. 2d 633, 635 (E.D. Va.

2010). Under Title IV, for-profit schools receive the benefit of payment in full, with no

liability if loans are not repaid and regardless of performance. Consequently, these

schools could profit from enrolling and retaining students who do not benefit from the

academic programs paid for with Title IV funds, while the government is "left to pick up

the tab for the billions of dollars in attendant losses." *Educ. Mgmt. Corp.*, 2012 WL

1658482, at *19-20 (quoting Sen. Rep. No. 102-58 (May 17, 1991)).

The available data shows that these concerns are justified. According to DOE

statistics, "although students at for-profits represent only 11 percent of all higher-

education students, they represent 26 percent of loan borrowers and 43 percent of loan

defaulters." *ITT Educ. Servs., Inc.*, 2012 WL 266943, at *2 (citing Gayland O. Heathcoat

II, *For-Profits Under Fire: The False Claims Act as a Regulatory Check on the For-

Profit Education Sector*, 24 Loy. Consumer L.Rev. 1, 4 (2011)). At the same time, "more

than 25 percent of for-profits derive 80 percent of their revenues from taxpayer-funded

federal financial aid." *Id.*

These concerns are relevant here because a *per se* rule rejecting implied false

certification liability could essentially immunize for-profit institutions from FCA liability

for material noncompliance with the PPA. A Title IV eligible institution requests

payments routinely and frequently, hundreds or thousands of times per year. Instead of

demanding a statement of compliance each and every time an institution draws down

17

Title IV funds, the government makes each institution expressly agree to comply with the applicable statutes and regulations as an absolute prerequisite to Title IV eligibility. But this decision on how to structure the Title IV bureaucracy does not inherently render compliance with the PPA irrelevant to the government's payment decision. As the Seventh Circuit noted in *Main*, "If a false statement is integral to the causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork." *Main*, 426 F.3d at 916. An institution should not be permitted to avoid liability for practices aimed primarily at acquiring federal funds to which it is not entitled, simply because of how the relevant paperwork is shuffled. *Cf. Costner*, 153 F.3d at 677 ("[T]hose actions by the claimant which have the purpose and effect of causing the United States to pay out money . . . are properly considered 'claims' within the meaning of the FCA.").

Declining to recognize implied certification liability in the Title IV context would produce an illogical result, as the very purpose of the FCA is "protecting the federal fisc," *Vigil*, 639 at 796. Indeed, the court in *Onnen* noted its "agree[ment] with the government that Congress intended to allow the government to choose among a variety of remedies, both statutory and administrative, to combat fraud." *Onnen*, 688 F.3d at 415. But rejecting implied certification liability could deprive the government of a valuable statutory tool for combating fraud.

In sum, Heritage has not shown that Relators' implied false certification theory should be dismissed as a matter of law. On the other hand, nothing set out above is meant to suggest that any and every violation of a provision regulating the administration

18

of Title IV funds is material to the government's payment decision.  But materiality is a

"complex" and "fact-intensive" issue.  *Onnen*, 688 F.3d at 414-15.  Whether or not

Relators can ultimately prove that any or all of the violations alleged in the Amended

Complaint were material to the government's payment of Title IV funds is a different

question entirely.  But it is plausible that the type of violations alleged in the Amended

Complaint, which range from outright theft to unlawful practices designed to maximize

the receipt of Title IV funds, would have caused the government to refuse, or demand

repayment of, Title IV financial aid.  Consequently, the Amended Complaint states a

claim because it alleges that Heritage used its false promises of compliance to draw down

Title IV funds while intentionally violating conditions material to the government's

payment decision.

      **B.**      **The Amended Complaint Satisfies FRCP 9(b)**

Heritage alternatively argues that, even if Relators' theories of liability are viable,

the Amended Complaint should be dismissed because it lacks the particularity required

by FRCP 9(b).  "Because the FCA is an anti-fraud statute, the Complaint's false-claim

allegations must comply with Rule 9(b)—a party must state with particularity the

circumstances constituting fraud."  *Vigil*, 639 F.3d at 796 (quotation omitted).  To satisfy

this requirement, "the complaint must identify the who, what, where, when, and how of

the alleged fraud."  *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556

(8th Cir. 2006) (quotation omitted).   Relators do not need to "allege specific details of

*every* alleged fraudulent claim," but they "must provide *some* representative examples of

[the] alleged fraudulent conduct, specifying the time, place, and content of [the] acts and the identity of the actors." *Joshi*, 441 F.3d at 557.

The Amended Complaint contains sufficiently particular descriptions of the circumstances constituting the alleged fraud to withstand Heritage's motion to dismiss. For example, the Amended Complaint provides a detailed account of how Heritage allegedly manipulated student attendance records in order to claim unearned Title IV funds. [Doc. # 8 at 20-24]. The Amended Complaint claims that Heritage referred to this practice as a student "ride out." [Doc. # 8 at 20]. The Amended Complaint identifies seven students with whom this "ride out" purportedly occurred, provides approximate dates for these representative examples, and describes the particular techniques used to fraudulently retain students in order to collect unearned Title IV financial aid. [Doc. # 8 at 20-22]. The Amended Complaint also describes specific instances where Relators claim to have observed Heritage administrators directly falsifying attendance records in order to fraudulently retain withdrawn students. [Doc. # 8 at 21-22].

In addition, Relator Miller claims that she personally attended weekly retention meetings led by Heritage's Retention Coordinator and Director of Education. [Doc. # 8 at 22]. According to the Amended Complaint, the "ride out" policy was openly discussed at these meetings, and high ranking administrators expressly stated that the purpose of this policy was to keep students long enough to "grab" the entire amount of tuition that could be paid under Title IV. [Doc. # 8 at 22]. The Amended Complaint also includes specific accounts of instances where Heritage administrators allegedly threatened,

20

harassed, or lied to students who wanted to withdraw in order to retain these students long enough to collect all of the available Title IV funds. [Doc. # 8 at 22-23].

Similarly, the Amended Complaint provides thorough descriptions of other practices Heritage allegedly used to bilk the government out of Title IV funds. The Amended Complaint contains representative examples of Heritage keeping, or attempting to keep, Title IV financial aid money it was legally required to disburse to students. [Doc. # 8 at 30-31]. According to the Amended Complaint, Heritage's Assistant Director of Education and Financial Aid Director told Relators that it was Heritage's stated policy to engage in this type of misappropriation. [Doc. # 8 at 29]. In addition, the Amended Complaint provides representative examples of Heritage admitting unqualified students and then falsifying grades and other records to keep the students moving through the programs so that Heritage could maximize Title IV payments. [Doc. # 8 at 35-40]. Heritage does not seem to contest the Amended Complaint's sufficiency with respect to these alleged violations.

Heritage does, however, go to great lengths to disprove the Amended Complaint's claim that Heritage violated the incentive compensation ban. But on this issue, Heritage seemingly conflates its motion to dismiss with a motion for summary judgment. The Amended Complaint alleges that Heritage administrators were paid bonuses if they could retain students long enough to earn one hundred percent of available Title IV funds. [Doc. # 8 at 51]. The Amended Complaint further claims that, as a part of this incentive program, Relator Miller and Heritage's Retention Coordinator were given special rewards based on their successful retention of students. [Doc. # 8 at 51]. Heritage argues

21

that these payments did not actually violate the ban, however, because the employees identified were not subject to the ban and, alternatively, the payments were protected by the "safe harbors" contained in 34 C.F.R. § 668.14(b)(22)(ii)(E)-(H).

But Heritage's argument depends on what Relators can ultimately prove, making the resolution of this claim at this stage premature. For instance, Relators' claim depends on whether or not the named individuals were "engaged in any student recruitment or admission activity, or in making decisions regarding the awarding of title IV, HEA program funds . . . ." *See* 34 C.F.R. section 668.14(b)(22)(i). Heritage asks the Court to infer from the official titles of the named individuals that these persons did not fall within this definition. But drawing all reasonable inferences in favor of Relators, it is plausible that a "Program Manager" and a "Retention Coordinator" were involved in these types of activities.

Regarding the safe harbors, Heritage argues that the alleged awarding of a gift card was not improper if the card was worth less than $100, and the Amended Complaint does not state the amount the card was worth. Not only is this itself a question of fact that precludes dismissal at this stage, Heritage ignores the Amended Complaint's claim that these cards were awarded quarterly. [Doc. # 8 at 51]. The safe harbor Heritage cites permits no more than one annual gift regardless of value. 34 C.F.R. § 668.14(b)(22)(ii)(H). Whether or not the safe harbors protect the other particular payment set forth in the Amended Complaint also depends on Heritage's motive for providing the compensation. Though Heritage claims otherwise, according to the Amended Complaint, the compensation was paid based on retention past the point where

22

Heritage could claim one hundred percent of a student's Title IV financial aid. Finally, even if these specific payments did not violate the incentive ban, it is reasonable to infer that if Heritage was giving bonuses to these individuals, it was also providing them to others. This inference is all the more reasonable in light of the Amended Complaint's detailed description of Heritage's policy of encouraging its staff to engage in student "ride outs."

For all of the foregoing reasons, the Amended Complaint pleads each of the alleged regulatory violations in a manner sufficient to permit Heritage "to respond specifically and quickly" and thus satisfies FRCP 9(b). *See Joshi*, 441 F.3d at 556.

### 1. Failure to Allege a Specific Claim for Payment

Heritage alternatively claims that the Amended Complaint lacks particularity because it does not identify a single, specific false claim for payment that Heritage submitted to the government. But Heritage's argument overlooks the particular theories of liability on which Relators' claim is based. Heritage is correct that in cases alleging express false certification the complaint must contain some specific examples of false claims that were actually submitted to the government. *Vigil*, 639 at 799; *Joshi*, 441 F.3d at 556-57. As discussed previously, however, Relators proceed on two distinguishable theories, rendering these cases inapposite.

Under either of the two theories advanced by Relators, the specific requests for Title IV disbursements were of only ancillary importance. That the individual requests for payment did not contain an expressly false statement was a product of bureaucratic design. What is relevant is that the Amended Complaint claims Heritage continually

23

requested Title IV payments while engaging in systematic, unlawful practices specifically designed to misappropriate Title IV funds. *See Costner*, 153 F.3d at 677 ("[T]hose actions by the claimant which have the purpose and effect of causing the United States to pay out money . . . are properly considered 'claims' within the meaning of the FCA."). FCA liability attaches because the Amended Complaint plausibly claims that the government relied on Heritage's false statements in the PPA in deciding to disburse Title IV funds. The circumstances constituting fraud are Heritage's allegedly systemic noncompliance with the PPA coupled with its continual requests for Title IV payments. This is what must be pleaded with specificity under FRCP 9(b) and, as set out above, the Amended Complaint meets this requirement.

There is no shortage of things left for Relators to prove. Under the first theory of liability, Relators would have to prove that Heritage intended not to comply with the PPA at the time it executed this agreement and subsequently did not comply in a manner material to the government's payment decision. Alternatively, Relators would have to prove that Heritage did not comply with the PPA in a manner material to the government's payment decision and that the government in fact relied upon the promises made in the PPA when it made the Title IV payments. But it is sufficient here that each of these claims is plausible and stated with sufficient particularity to allow Heritage to reply "specifically and quickly," *Joshi*, 441 F.3d at 556.

## C.  Relators' Retaliation and Wrongful Termination Claims

Heritage argues that Relators' claims for retaliation and wrongful termination do not show that Relators are entitled to relief and thus must be dismissed under FRCP

24

8(a)(2).[1]  But Heritage's argument is based on the inaccurate statement that the full extent of what Relators allege is that they were criticized and experienced stress.  Relator Miller does allege that she was subjected to criticism.  But Relator Miller also claims that Heritage's retaliation included:  1) excluding her from meetings she had previously been required to attend; 2) having another administrator take over Relator Miller's program; and 3) denying her a promotion.  [Doc. # 8 at 57-58].  As a result of her diminution in duties, loss of opportunity, and the hostile work environment created by Heritage, Relator Miller claims that she was forced to resign and consequently was constructively discharged.  [Doc. # 8 at 58].  The Amended Complaint also identifies which Heritage employees were specifically involved in the alleged retaliation.  [Doc. # 8 at 57-58].  Relator Miller's claims for retaliation and wrongful termination thus satisfy the requirements of FRCP 8(a)(2).

Similarly, Relator Sillman does claim that she was criticized, as Heritage states.  [Doc. # 8 at 60].  But Relator Sillman also claims that she was terminated because of her efforts to call attention to and stop Heritage's allegedly fraudulent practices.  [Doc. # 8 at 62].  Given that Heritage terminated Relator Sillman approximately eleven days after Relator Sillman sent her most forceful and critical letter, Relator Sillman's claim is plausible.  [Doc. # 8 at 60, 62].  Consequently, Relator Sillman's claims for retaliation and wrongful termination also satisfy FRCP 8(a)(2).

---

[1] Heritage also moves to dismiss Relators' 31 U.S.C. § 3730(h) claims on the ground that, absent a valid FCA claim, these claims fail as a matter of law.  Relators respond that a § 3730(h) claim does not require an ultimately successful FCA action, but rather only a good faith, objectively reasonable belief that the employer was submitting false claims for payment.  The Court need not resolve this issue, however, because the Amended Complaint does state a claim under the FCA.

### 1. Relators' Missouri Wrongful Termination Claims Are Not Preempted

Heritage argues that Relators' state law claims for wrongful termination are preempted by their federal statutory retaliation claims. "[A] statutory right of action shall not be deemed to supersede and displace remedies otherwise available at common law in the absence of language to that effect unless the statutory remedy fully comprehends and envelops the remedies provided by common law." *Fieshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 95 (Mo. 2010) (en banc). In Counts II and III, Relators seek relief under 31 U.S.C. § 3730(h), which provides a cause of action to redress retaliatory actions taken by an employer because of the employee's pursuit of an FCA action or efforts to stop an FCA violation. In Counts IV and V, Relators bring wrongful termination claims under Missouri's public policy exception to the at-will employment doctrine. Heritage argues that Counts IV and V should be dismissed because the remedies available under § 3730(h) provide Relators with an adequate remedy at law.

But Relators' § 3730(h) claims and wrongful termination claims seek to vindicate fundamentally different rights. The former claims are based on Heritage's alleged retaliatory response to Relators' efforts to expose and prevent FCA violations. But Relators' wrongful termination claims are not premised on Relators' reports of or refusal to participate in any alleged FCA violations. Rather, Relators claim that Heritage took adverse actions against them in response to their reports about and refusal to participate in violations of state and federal statutes and regulations governing the operation of proprietary schools. [Doc. # 8 at 63, 65]. The alleged violations are not limited to the

26

provisions applicable under Title IV.  They also encompass the statutes and regulations applicable to Heritage's accreditation and license to operate in Missouri.  Heritage argues that the public policy implicated is nonetheless the same that is at issue under § 3730— protection of the federal fisc.  But Heritage cannot credibly maintain that preventing the federal government from paying false claims is the sole, or even primary, concern underpinning the array of statutes and regulations, both state and federal, which provide the public policy ground for Relators' Missouri wrongful termination claims.

Consequently, § 3730 does not fully comprehend and envelop Relators' state law claims because the former only offers remedies for retaliatory actions taken in response to an employee's efforts to pursue an FCA action or prevent an FCA violation.  Relators' state law claims seek to remedy an entirely different wrong:  retaliatory actions taken in response to reports about and refusal to participate in noncompliance with state and federal laws and regulations governing the operation of proprietary schools.  As such, § 3730 does not preempt Relators' common law wrongful termination claims.

### 2.      Failure to Report to "Proper Authorities"

Heritage also argues that Relator Miller's wrongful termination claim fails as a matter of law because the Amended Complaint does not allege that Relator Miller reported the alleged violations to proper authorities.  The public policy exception to Missouri's at-will employment doctrine recognizes four distinct circumstances in which an employee may pursue a wrongful termination claim under this exception.  *Porter v. Reardon Mach. Co.*, 962 S.W.2d 932, 936-37 (Mo. Ct. App. 1998).  Relator Miller brings her claim pursuant to the first two.  These are:  "(1) refusing to perform an illegal act or

27

Case 4:11-cv-00112-RK   Document 52   Filed 12/12/12   Page 27 of 29

an act contrary to a strong mandate of public policy; [and] (2) reporting wrongdoing or violations of law or public policy by the employer or fellow employees to superiors or third parties." *Id*. Although "whistleblowing can occur if proper company authorities are notified of wrongdoing," the second category may not be available if the claimant reported the wrongdoing to a supervisor who was also the wrongdoer. *Id.* at 937. Heritage claims that Relator Miller's letter reporting Heritage's alleged wrongdoing, attached to the Amended Complaint, speaks for itself and conclusively shows that she only reported the misconduct to other wrongdoers.

Even if Heritage were correct on this point, however, dismissal would not be warranted because Heritage does not address the fact that Relator Miller also brings a claim under the first public policy exception: refusing to violate the clear public policy mandate contained in the relevant statutes and regulations. [Doc. # 8 at 63]. Consequently, Relator Miller's wrongful termination claim survives Heritage's motion to dismiss irrespective of her alleged failure to report to proper authorities.

But an examination of Relator Miller's letter suggests that she may have reported to proper authorities. Relator Miller did state in her letter that she believed the letter's recipients were aware of and assisted in acts of fraud. [Doc. # 8-2 at 1]. In the very next sentence, however, she asked the letter's recipients to advise her whether or not the U.S. Attorney ought to be notified about the problems she described in the letter. [Doc. # 8 at 1]. In addition, at the end of the letter, she asked its recipients to secure her personnel file to ensure that documents were not added to her file in retaliation for her reports. [Doc. # 8 at 2-3]. If Relator Miller believed that the letter's recipients were the ones orchestrating

28

the misconduct she described therein, the latter two requests would make little sense. Rather, the letter, read in its entirety, permits the reasonable inference that Relator Miller did not believe the letter's recipients understood the full extent of the misconduct taking place and that she wrote in a good faith effort to convince them to take action. Whether or not the recipients of Relator Miller's letters were proper company authorities thus presents a question of fact that cannot be resolved at this stage of the proceedings.

## III. Conclusion

For the reasons set forth above, Heritage's motion to dismiss for failure to state a claim and, alternatively, for failure to plead with sufficient particularity [Doc. # 22] is DENIED.

<u>s/ Nanette K. Laughrey</u>
NANETTE K. LAUGHREY
United States District Judge

Dated: <u>December 12, 2012</u>
Jefferson City, Missouri