# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. CHICKOIYAH MILLER and CATHY SILLMAN, | ) ) ) ) | |
| Relators/Plaintiffs, | ) ) | No. 4:11-CV-00112-NKL |
| v. | ) ) | |
| WESTON EDUCATIONAL, INC., d/b/a HERITAGE COLLEGE, | ) ) ) | |
| Defendant. | ) | |

## ORDER

Pending before the Court is Defendant Weston Educational, Inc., d/b/a Heritage College ("Heritage")'s motion for summary judgment. [Doc. # 212]. For the reasons set forth below, Heritage's motion is GRANTED.

## I.     Background

Heritage is a for-profit, post-secondary school with campuses in Kansas City, Missouri as well as several other states. Pursuant to Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070, *et seq.*, the federal government provides financial aid to post-secondary students, including those at proprietary schools, in the form of grants, loans, and other assistance. Qualifying students use these funds to pay for their tuition and other educational expenses. In order for Heritage's students to receive Title IV financial aid, Heritage must periodically submit an application to establish its Title IV

eligibility and execute a Program Participation Agreement with the Secretary of the Department of Education ("DOE").  Once eligibility is established, Heritage and its students then submit additional applications for specific disbursements of federal financial aid.

Heritage last executed a PPA in February of 2009.  The PPA provides, "The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program."  By executing the PPA, Heritage certified that it "understands and agrees that it is subject to and will comply with . . . the Student Assistance General Provisions set forth in 34 CFR Part 668," and, more generally, agreed to "comply with all statutory provisions of or applicable to Title IV of the HEA, [and] all applicable regulatory provisions prescribed under that statutory authority."  The PPA further requires Heritage to "establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds received from the Secretary or from students under the Title IV, HEA programs."

With respect to the maintenance of records, the applicable regulations, in relevant part, require Heritage to maintain:

> (iii) Documentation of each student's or parent borrower's eligibility for title IV, HEA program funds;
>
> (iv) Documentation relating to each student's or parent borrower's receipt of title IV, HEA program funds, including but not limited to documentation of—
>
> ***

(C) The amount, date, and basis of the institution's calculation of any refunds or overpayments due to or on behalf of the student, or the treatment of title IV, HEA program funds when a student withdraws; and

(D) The payment of any overpayment or the return of any title IV, HEA program funds to the title IV, HEA program fund, a lender, or the Secretary, as appropriate;

\*\*\*

(vii) Documentation supporting the institution's calculations of its completion or graduation rates under §§ 668.46 and 668.49.

34 C.F.R. § 668.24(c)(1). Section 668.24(f) further provides that each participating institution shall provide access to these records for the purposes "of audits, investigations, program reviews, or other reviews authorized by law."

Among the records that may be relevant to the distribution or retention of Title IV funds are student grade and attendance records. *See* §§ 668.34, 668.22. More specifically, a student's grades are relevant because each student's continued Title IV eligibility is predicated on the student maintaining "satisfactory academic progress in his or her course of study according to the institution's published standards of satisfactory academic progress that meet the requirements of § 668.34." § 668.2(f). Section 668.34(a), in turn, requires Heritage to "establish a reasonable satisfactory academic progress policy for determining whether an otherwise eligible student is making satisfactory academic progress in his or her educational program and may receive assistance under the title IV, HEA programs." This policy must specify "the grade point average (GPA) that a student must achieve at each [periodic] evaluation" of a student's academic progress. § 668.34(a)(4)(i). With the exception of students placed on financial

aid warning or probation, the policy must provide "that, at the time of each evaluation, a student who has not achieved the required GPA, . . . is no longer eligible to receive assistance under the title IV, HEA programs." § 668.34(a)(7).

Attendance records are relevant to Title IV funds because Heritage is obligated to refund any unearned portion of the federal aid provided to a student if the student withdraws prior to completing the period for which the funds were awarded. Specifically, when a student withdraws who received Title IV assistance, Heritage "must determine the amount of title IV grant or loan assistance that the student earned as of the student's withdrawal date." § 668.22(a). Withdrawal may be either official or unofficial, with the latter occurring when a student stops attending for fifteen consecutive school days without official notification. If a student withdraws, Heritage must first determine the student's withdrawal date, meaning "the student's last date of academic attendance as determined by the institution from its attendance records." § 668.22(b)(1). For the purposes of calculating a Title IV refund, the last date of physical presence at school constitutes the student's last date of attendance.

Heritage then uses the last date of attendance to calculate the percentage of Title IV financial aid earned by the student, which is based on the percentage of the payment period or period of enrollment that the student completed as of the last date of attendance. *See* § 668.22(e)(2). If the student completed sixty percent or more of the relevant period, the student is considered to have earned one-hundred percent of the financial aid. § 668.22(e)(2)(ii). If the student completed less than sixty percent of the relevant period, the percentage of financial aid that the student earned is equal to the percentage of the

period the student completed.  § 668.22(e)(2)(i).  In this scenario, the complement percentage of financial aid awarded, i.e. the amount equal to the percentage of the period the student did not complete, must be refunded to the DOE.  §§ 668.22(e)(4), (g).

Relator Miller was employed at Heritage's Kansas City campus from July of 2006 until she resigned on January 7, 2011.  Relator Sillman was employed at Heritage's Kansas City campus from July of 2010 until she was terminated on December 27, 2010.  While employed by Heritage, both Relators made formal complaints regarding what they believed to be Heritage's fraudulent handling of Title IV funds.  Both Relators claim that they were retaliated against and discharged for making these complaints.

Relators subsequently initiated this *qui tam* action under the False Claims Act, ("FCA"), 31 U.S.C. § 3729, claiming that Heritage's fraudulent practices resulted in the improper payment and retention of Title IV funds.  Both Relators also assert claims for retaliation under the FCA and wrongful discharge under Missouri law's public policy exception to the at-will employment doctrine.

## II.    Discussion

### A.    Relators' FCA Claims

Relators' asserted basis for Heritage's liability under the FCA has narrowed dramatically from their original complaint.  Relators now principally rely on evidence of instances where Heritage administrators either:  (1) changed student grades without the

instructor's knowledge and consent; or (2) awarded students unearned attendance hours.[1] For the purposes of this motion, Heritage generally does not attempt to refute the evidence that grade and attendance records were altered or fabricated, though it stops short of conceding that the records were deliberately falsified. Instead, Heritage argues that, "even if the grades and attendance alleged are false, Relators' claims fail as a matter of law," because Relators have failed to show that the records at issue were material to the DOE's payment decision. [Doc. # 221 at 15-16]. Heritage maintains that a causal connection between the purportedly falsified records and a financial loss to the Government is an essential element of FCA liability. Relators respond that evidence of false records can give rise to FCA liability even in "the absence of proof that particular falsifications led to particular payments." [Doc. # 218 at 47].

As a result, the dispositive question presented with respect to Relators' FCA claims is whether Relators must show that Heritage's alteration of student grade and attendance records actually resulted in the improper disbursement or retention of Title IV funds. The relevant provision of the FCA establishes liability as to any person who "knowingly makes, uses, or cause to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). The term "material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." § 3729(b)(2)(4). The broad language used in the FCA reflects the legislature's intent for this statute "to reach all types of fraud,

---

[1] Relators also claim that Heritage fabricated graduate placement records. As discussed below, however, Relators have failed to establish any possible connection between such records and the disbursement or retention of Title IV funds.

without qualification, that might result in financial loss to the Government." *United*

*States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). While the FCA is thus capable of

reaching "all fraudulent attempts to cause the Government to pay out sums of money," *id.*

at 233, the FCA "still requires *a causal link* between the 'false statement or record' and

the Government's payment of a false claim." *U.S. ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d

791, 799 (8th Cir. 2011) (emphasis added).

Nonetheless, Relators cite *United States ex rel. Main v. Oakland City University*,

426 F.3d 914 (7th Cir. 2005), for the proposition that "Heritage can be held liable for

executing the PPA, having no intention to perform its obligations thereunder, regardless

of whether its subsequent misconduct cost the government money." [Doc. # 218 at 47].

However, the *Main* court specifically ruled that the FCA "requires a causal . . .

connection between fraud and payment," and then held that the relator had established

that causal connection by the very nature of the regulatory prohibition at issue. *Main*,

426 F.3d at 916-17. In *Main*, the relator alleged that the defendant fraudulently certified

its intent to comply with the prohibition against paying recruiters contingent fees for

enrolling students. *Id.* at 916. This ban was enacted to address the concern "that

recruiters paid by the head are tempted to sign up poorly qualified students who will

derive little benefit from the subsidy and may be unable or unwilling to repay federally

guaranteed loans." *Id.* In moving to dismiss the relator's FCA claim, the defendant

argued that false certification of compliance with the incentive compensation ban does

not violate the FCA because a violation of the ban "usually does not lead to financial loss

to the United States-for any given student may well have enrolled, and been eligible, anyway." *Id.* at 917.

The *Main* court rejected this claim, reasoning that FCA liability attaches "even if (indeed, *especially* if) actual loss is hard to quantify, and at the margin contingent payments will lead to *some* unwarranted enrollments (and thus some unjustified federal disbursements). That is, after all, why contingent payments are forbidden." *Id.* Thus, the *Main* court found that a violation of the incentive compensation ban necessarily results in some unjustified disbursements of financial aid, even if it is difficult, if not impossible, to prove which specific payments resulted from the impermissible compensation arrangement. But Relators here have not similarly shown that actual loss resulting from false grade and attendance records cannot be objectively quantified. Either the student was or was not qualified to receive financial aid based on accurate grade and attendance records. Either the student did or did not receive financial aid. In contrast, whether a student would or would not have been recruited and admitted absent a bounty cannot be objectively measured, since discretion by the student and the college would be a factor.

Relators' reliance on *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006), is equally unpersuasive. *Hendow* also concerned an alleged violation of the ban on recruitment incentives. *Id.* at 1168-69. The *Hendow* court held that the relators' allegations of intentional and knowing violations of this ban stated an actionable FCA claim under either of two theories: "(1) false certification (either express

or implied); and (2) promissory fraud." *Id.* at 1171. With respect to the false

certification theory, the *Hendow* court emphasized:

> [T]he false statement or course of conduct must be material to the government's decision to pay out moneys to the claimant. This is plain from our focus on (1) whether the false statement is the cause of the Government's providing the benefit; and (2) whether any relation exists between the subject matter of the false statement and the event triggering Government's [sic] loss.

*Id.* at 1172 (citation and quotation omitted). With respect to the promissory fraud theory

of liability, the *Hendow* court found the Seventh Circuit's decision in *Main* persuasive

and expressly agreed with the *Main* court's ruling "that the False Claims Act requires 'a

causal . . . connection between fraud and payment.' " *Id.* at 1174 (quoting *Main*, 426

F.3d at 916). The *Hendow* court further enumerated the following essential elements for

an FCA claim under either theory: "(1) a false statement or fraudulent course of conduct,

(2) made with scienter, (3) that was material, *causing* (4) the government to pay out

money or forfeit moneys due." *Id.* (emphasis added). As in *Main*, the *Hendow* court

concluded that an intentional violation of the incentive compensation ban is material to

the Government's decision to disburse Title IV funds. *Id.* at 1175-77.

Thus, neither *Hendow* nor *Main* supports the proposition that a false grade or

attendance record can give rise to FCA liability absent evidence that the false record

actually resulted in the improper distribution or retention of Title IV funds. The

additional cases Relators cite for the proposition that "Heritage can be made to repay all

the Title IV funds it received, not just amounts related to particular students whose grades

were falsified or whose attendance records were altered," [Doc.# 218 at 47], each

concerned the calculation of damages after an FCA violation had been proven. *See United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 90-92 (2d Cir. 2012); *United States v. Rogan*, 517 F.3d 449, 452-53 (7th Cir. 2008); *United States v. Mackby*, 339 F.3d 1013, 1019 (9th Cir. 2003). Nothing in any of these decisions suggests that Heritage can be held liable under the FCA even if the records it falsified were in no manner causally connected to the receipt or retention of federal funds.

Furthermore, even if these cases from other jurisdictions could be interpreted in the manner urged by Relators, controlling Eighth Circuit precedent makes clear that a causal connection between the false record and a loss to the Government is a necessary element of an FCA claim.

> [The FCA] requires a causal link between the false statement or record and the Government's payment of a false claim. . . . If a false statement is not made with the purpose of inducing payment of a false claim . . . the direct link between the false statement and the Government's decision to pay or approve a false claim is too attenuated to establish liability. . . . A false certification [of regulatory compliance] is therefore actionable under the FCA only if it leads the government to make a payment which it would not otherwise have made.

*Vigil*, 639 F.3d at 799 (citation and quotations omitted); *see also In re Baycol Prods. Litig.*, 732 F.3d 869, 874 (8th Cir. 2013) ("The FCA is not concerned with regulatory noncompliance, but with false or fraudulent claims that *cause* the government to pay money." (quotation omitted) (emphasis added)). Consequently, the fabrication of student grade and attendance records can only give rise to FCA liability if there is some causal link between the false records and the distribution or retention of Title IV funds.

   1.  *Student Grades*

Relators have presented evidence of numerous instances where Heritage administrators changed a student's failing grade to a passing grade without the instructor's knowledge and consent or instructed a teacher to change a failing grade to a passing grade. *E.g.*, [Docs. ## 218-23 at 3, 6, 8, 21-22; 218-35 at 8-9; 218-36 at 10; 218-37 at 4; 218-38 at 13; 218-43 at 10-12; 218-47 at 9]. However, this is as far as the evidence goes. Relators have made no attempt to show that any of the altered grades actually resulted in the improper payment or retention of federal financial aid. Rather, Relators maintain that evidence of administrators altering grades, standing alone, is sufficient to establish Heritage's liability under the FCA.

Under the applicable regulations, however, a student's grades are only material to the disbursement of Title IV funds if, based on the student's cumulative GPA, the student has failed to make satisfactory academic progress. *See* §§ 668.32(f), 668.34. Thus, evidence of isolated instances where student grades were altered does not show that these records, even if fraudulent, were material to the DOE's decision to disburse financial aid. For example, there is no evidence that any of these students were on financial aid probation and, but for the altered grade, would have been ineligible for subsequent financial aid disbursements. In fact, there is no evidence or analysis that suggests the isolated failing grades identified by Relators, standing alone, would prevent a student from qualifying for federal financial aid. Relators have also not presented any argument or authority that suggests Heritage's institutional eligibility could or would be terminated if the Government was aware that administrators had altered grades awarded by

instructors. There is simply no basis, on this record, for concluding that any of the altered grades actually resulted in the unwarranted disbursement of federal financial aid.

In sum, Relators have, at most, established the existence of a false record. Absent some causal connection between these records and the disbursement of federal financial aid, this evidence is not sufficient to establish a submissible FCA claim. *See, e.g.*, *Vigil*, 639 F.3d at 799.

2. *Attendance Records*

Relators maintain that Heritage's practice of manipulating attendance records may have resulted in Heritage improperly retaining unearned federal financial aid. There can be little doubt that an institution's attendance records could be material to the proper retention of Title IV funds, in so far as a student's recorded last date of attendance may affect whether any payment must be refunded and, if so, how much. Relators have submitted evidence of numerous instances where students were awarded attendance hours when they apparently did not physically attend class. *E.g.*, [Docs. ## 218-23 at 7-20; 218-36 at 50-51; 218-39 at 13; 218-41 at 9; 218-44 at 25-26, 59-60]. As with the records of student grades, however, Relators have made no attempt to show that any of the altered last dates of attendance actually resulted in Heritage retaining Title IV funds that ought to have been refunded. Instead, Relators argue that Heritage's unreliable attendance records altered "the last date of attendance and the [return to Title IV] calculation," such that "Heritage improperly obtained and kept federal funds it otherwise *might* have had to return." [Doc. # 218 at 51] (emphasis added).

As this suggests, Relators' claim that Heritage improperly retained Title IV funds by falsifying attendance records is speculative. Simply put, not every record of attendance is material to the repayment of Title IV funds. For instance, if a fraudulent last date of attendance resulted in a report that a student completed seventy-percent of a payment period, when in fact she only completed sixty-five percent, this would have no effect on whether Heritage was required to refund any Title IV funds. Similarly, if a false date of attendance was recorded, but then was not actually used to calculate a Title IV refund, the false record would be wholly immaterial to whether funds were properly retained.

Although the evidence presented by Relators gives rise to the possibility that some of the apparently fabricated attendance hours were recorded in order to delay the student's effective withdrawal date, and thereby increase the amount of federal aid that Heritage could retain, Relators have not attempted to identify even a single instance where this actually occurred. It is not the Court's role to search through the voluminous record in this case and perform the analysis necessary to determine whether inconsistent or fabricated attendance records ever resulted in the improper retention of Title IV funds. *See, e.g.*, *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1085 (8th Cir. 1999) ("[A] district court is not obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim."). As Relators have identified no specific evidence that any false attendance records actually resulted in the improper retention of Title IV funds, they have failed to establish a submissible FCA claim based on this evidence.

### 3.    *False Certification/Promissory Fraud*

Relators argue that even if the fraudulent records created by Heritage did not directly impact the payment or retention of federal funds, Heritage is still liable under the FCA because Heritage agreed to keep accurate records when it executed the PPA.  This claim appears to be premised on the false certification and/or promissory fraud theories recognized by the Ninth Circuit in *Hendow*, discussed above.  As explained previously, and as Relators state in their brief, both of these theories still require a showing that the fraudulent certification or promise was material to the Government's payment decision. [Doc. # 218 at 44] ("To establish a claim under a false certification theory, a litigant must prove  . . . the claim was material to the government's decision to pay out money.").

Absent some showing that Heritage manipulated grade and attendance records in a manner that affected a student's Title IV eligibly or the amount of Title IV funds that ought to have been refunded, Relators have failed to show that Heritage violated any material condition on the receipt of federal funds.  Relators generally allege that Heritage promised to maintain accurate grade and attendance records when it executed the PPA. But any obligation to this effect is of a very different character from the explicit promise not to violate the incentive compensation ban at issue in *Hendow*.  In *Hendow*, the court remarked that:

> [T]he eligibility of the University under Title IV and the [HEA]—and thus, the funding that is associated with such eligibility—is *explicitly* conditioned, in three different ways, on compliance with the incentive compensation ban. . . . [T]hese are not ambiguous exhortations of an amorphous duty.  The statute, regulation, and agreement here all explicitly condition participation and payment on compliance with, among other

things, the precise requirement that relators allege that the University knowingly disregarded.

*Hendow*, 461 F.3d at 1175-76. By contrast, Heritage did not explicitly promise to prohibit administrators from changing student grades or to only award grades given by instructors. Nor did Heritage promise to maintain perfect attendance records that, in every instance, are based on the student's physical presence in the classroom. Rather, Heritage agreed to maintain records relevant to the distribution and repayment of federal financial aid and to make those records available in the event of an audit or other investigation. Any promise or duty to maintain accurate grade and attendance records is, at most, an implied obligation that arises from the institution's duty to evaluate the academic progress of its students and properly refund unearned Title IV financial assistance. Relators have presented no evidence or authority that suggests that an institution's grade or attendance records, to the extent that they did not impact the distribution or repayment of Title IV funds, would be of any concern to the DOE.

The administrative enforcement actions cited by Relators further evidence this understanding of Heritage's record keeping obligations. Each of the decisions cited by Relators involved an appeal from a Final Program Review Determination ("FPRD"), which included numerous student-specific findings that Title IV funds were improperly distributed or retained. *See LA Lan 2000 Computer Training Ctr.*, No. 05-50-SP, 2010 WL 3514127, at *1-2, 10-11 (Dep't of Educ. Aug. 20, 2010); *DeMarge Coll.*, No. 04-39-SP, 2009 WL 2906470, at *1, 4-7 (Dep't of Educ. July 31, 2009); *EdNet Career Inst.*, No. 07-41-SP, 2009 WL 3255417, at *1, 11-12 (Dep't of Educ. Aug. 31, 2009). On

appeal from the FRPD, the institution has the burden of proving that all Title IV funds were properly distributed or retained. *E.g.*, *DeMarge Coll.*, 2009 WL 2906470, at *2. In two of the actions cited by Relators, the DOE was permitted to recover all of the funds disbursed under Title IV, but only because the institution failed to adequately respond to a DOE-ordered audit and subsequently failed to meet its burden of proof on appeal. *LA Lan 2000 Computer Training Ctr.*, 2010 WL 3514127, at *13 ("This Tribunal has consistently held that when an institution does not respond to a properly ordered file review, the Respondent can be held liable for all Title IV funds dispersed for the time period covered by the ordered file review."); *DeMarge Coll.*, 2009 WL 2906470, at *1, 8. By contrast, in *EdNet*, the institution's liabilities were assessed on a student-by-student basis. *EdNet Career Inst.*, 2009 WL 3255417, at *6, 9, 11.

As these DOE administrative actions make clear, the DOE's concern is not simply whether an institution's records are accurate, but rather whether any inaccuracies, as a result of fraud or negligence, led to the improper distribution or retention of Title IV funds. There can be little doubt that, if Heritage intended to manipulate grade and attendance records in order to improperly receive and retain Title IV funds, or actually manipulated these records in such a manner, this would be material to Heritage's initial and continued eligibility to receive Title IV funds. However, Relators have not presented evidence that any of these records were altered to achieve this result. Consequently, Relators have failed to present evidence that Heritage violated a material requirement of the PPA or the applicable regulations and Heritage is entitled to summary judgment as to Relators' claim under the FCA.

### 4. Job Placement

Relators additionally claim that Heritage fabricated graduate placement records, but they have failed to establish any connection between this category of records and Title IV funds. Relators argue that the regulations require Heritage to have substantiated placement rates of at least seventy percent. [Doc. # 218 at 49]. The regulation cited by Relators, however, only applies to academic programs that require "at least 300 clock hours but less than 600 clock hours." 34 C.F.R. § 668.8(d)-(e). It is undisputed that Heritage's Kansas City campus does not have any programs that require fewer than 600 clock hours. *See* [Doc. # 213-2 at 2]. As section 668.8(e) is the only potential connection between job placement records and Title IV that Relators have identified, there is no basis for concluding that these records, even if fraudulent, were material to Heritage's receipt or retention of Title IV funds.

### B. FCA Retaliation

Heritage also argues that it is entitled to summary judgment on Relators' claims for retaliation under the FCA. The retaliation provision of the FCA provides a cause of action for employees who are "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, . . . in furtherance of an [FCA] action." 31 U.S.C. § 3730(h). To succeed on a claim for FCA retaliation, the plaintiff must show that: "(1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the

plaintiff's protected activity." *Schuhardt v. Washington Univ.*, 390 F.3d 563, 566 (8th Cir. 2004).

> 1.    *Relator Miller*

Heritage argues that it is entitled to summary judgment on Miller's claim for FCA retaliation because there is no evidence that it retaliated against Miller. Miller started working for Heritage in July of 2006, was promoted to program manager in September of 2008, and remained in that position until she resigned on January 7, 2011. [Docs. ## 218-63 at 41, 47, 57, 107; 213-13 at 2]. Miller testified that she did not experience any retaliation until after December 9, 2010, when she made her first formal complaint about Heritage's practices. [Doc. # 218-63 at 193].

Miller gave inconsistent testimony as to whether she was demoted from her position as program manager after December 9. *Compare* [Doc. # 218-63 at 47], *with* [Doc. # 218-63 at 213]. From Miller's testimony, it appears that she believed she had been effectively demoted, although no demotion was ever made formal or memorialized in writing. *See* [Doc. # 218-63 at 193, 210]. Miller's belief that she had been demoted was based on a single conversation she had with two administrators at the Kansas City campus, who told her that another administrator would be taking over her program because Miller needed to focus on obtaining her associate's degree. [Doc. # 218-63 at 193, 210]. Miller further testified that another administrator subsequently held a meeting without inviting or informing her, though Miller was never excluded from any meeting. [Doc. # 218-63 at 147, 193]. Miller only identified one instance where this occurred, and

she conceded that the subject of the meeting "was new," "something that just came up," and was not part of her job "at that point." [Doc. # 218-63 at 193].

Miller also testified that, on December 15, she met with Shannon Beeler, Vice President of Heritage College, who assured Miller that there was not going to be any change in her position. [Doc. # 218-63 at 210, 214]. With the possible exception of Saturday pay, Miller testified that her salary was not reduced and that she was never told that her salary was going to be reduced if she did not resign. [Doc. # 218-63 at 147, 210, 214, 216]. Regarding Saturday pay, Miller testified that she believed she would no longer be compensated for working on Saturday, but that she only worked one Saturday between December 9 and her resignation and she could not recall whether she was paid for this work. [Doc. # 218-63 at 213-14]. Aside from this one Saturday, Miller did not request any Saturday pay between December 9 and her resignation. [Doc. # 218-63 at 211-13]. Miller further testified that she was denied a position in career services that offered the same pay as her current position, which she described as a "lateral move." [Doc. # 218-63 at 147, 197, 215].

Based on this evidence, Miller has failed to present sufficient evidence of retaliation. Although Miller believed that she had been demoted, she testified that her pay was not reduced, which she stated would have accompanied a demotion. *See* [Doc. # 218-63 at 210] ("When you lose a position, you lose a salary."). Furthermore, aside from the loss of control over one meeting, which Miller testified involved matters not within the purview of her job, Miller did not identify any changes in her job responsibilities. With respect to the issue of Saturday pay, Miller's claim appears to be speculative, as it

rests solely on her recollection of a single Saturday after December 9, Miller could not recall whether she was or was not paid for that work, and she never again requested Saturday pay before choosing to resign. Miller's apparent assumptions about the changes in her employment are further undermined by Beeler's assurances that there would be no change in her position. *Cf. Trierweiler v. Wells Fargo Bank*, 639 F.3d 456, 461 (8th Cir. 2011) ("Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast."). Finally, Miller has presented no authority that suggests the denial of a lateral move within the same company, with no corresponding increase in pay, constitutes discrimination in the terms or condition of employment. Consequently, Miller has failed to present sufficient evidence from which a reasonable juror could find that Heritage retaliated against her.[2]

2.    *Relator Sillman*

Heritage also argues that it is entitled to summary judgment on Sillman's claim for FCA retaliation because the undisputed facts show that her termination was not motivated solely by her protected activity. Relators urge the Court to apply the *McDonnell Douglas* burden-shifting framework to this issue, as the First Circuit did in *Harrington v. Aggregate Industries Northeast Region, Inc.*, 668 F.3d 25, 30-31 (1st Cir. 2012). The *Harrington* court acknowledged, however, that its decision was the first published decision at the federal appellate level to apply this framework to an FCA retaliation claim, *id.* at 31, and no Eighth Circuit decision has since adopted this approach.

_____

[2] As discussed in more detail below, Miller has also failed to make a submissible case of constructive discharge.

By contrast, existing Eighth Circuit precedent has affirmed the use of the "dual motive" framework when considering an employer's motivation in the context of an FCA retaliation claim. *Norbeck v. Basin Elec. Power Co-op.*, 215 F.3d 848, 850-52 (8th Cir. 2000). Under this framework, "the ultimate issue of causation a plaintiff needs to establish is that the discharge was solely because of protected activity, and a finding of dual motive exonerates the employer." *Id.* at 851. To establish the employer's sole motive, the plaintiff must first demonstrate that he was fired because of his protected conduct, at which point the burden shifts to the employer to prove, by a preponderance of the evidence, "that it would have reached the same decision even in the absence of the protected conduct." *Id.* at 851-52; *see also Collins v. Ctr. for Siouxland*, No. C10-4015-PAZ, 2011 WL 2893038, at *10, 12-14 (N.D. Iowa July 15, 2011) (discussing *Norbeck* and ruling that, with respect to an FCA retaliation claim, "the court must determine whether there is evidence in the summary judgment record to support the plaintiffs' claims that they were terminated because of their whistleblower activities. If there is, the court then must determine whether [the employer] has shown it would have reached the same decision absent the protected activity.").

In this case, the undisputed evidence shows that Sillman was hired as Manager of Instructional Development in July of 2010 and received "a verbal advisement regarding her job performance and interpersonal skills" on October 28, 2010. [Doc. # 213-13 at 1]. Sillman subsequently received a written warning on November 2, 2010, due to "[h]er behavior and comments to other employees after the verbal advisement." [Doc. # 213-13 at 1]. A second written warning regarding Sillman's job performance was issued on

November 22, 2010, shortly before Sillman's first written complaint about Heritage's practices on November 23, [Doc. # 213-4 at 1], and her annual performance review on November 24. During Sillman's performance review, she was placed on a performance improvement plan and "she acknowledged that failure to meet expectations may result in her termination." [Docs. ## 213-13 at 2; 218-62 at 3]. Sillman sent a second written complaint about Heritage on December 16, 2010. [Doc. # 213-7].

Sillman was terminated on December 27, 2010. [Doc. # 218-62 at 4]. The notice of termination stated that "a review was conducted last week on her performance of her duties in meeting expectations since expectations were outlined on 11/24/10," and identified several specific instances of Sillman's failure to meet these expectations. [Doc. # 218-62 at 4-6]. For instance, it was noted that the Manager of Instructional Development at Heritage's Denver campus, which has a comparable population and staff to the Kansas City campus, performed sixty-five instructor observations during a six-month time frame, whereas Silliman had completed only six. [Doc. # 218-62 at 4].

In response to these undisputed facts, Sillman maintains that the timeline alone supports "the inference that Heritage's non-retaliatory reasons for Sillman's termination were pretextual." [Doc. # 218 at 56]. It is well-established, however, that where an employer proffers and properly supports a legitimate explanation for discharging an employee, temporal proximity alone is not sufficient to permit the inference that the justification is pretextual. *E.g.*, *Barnhardt v. Open Harvest Co-op.*, 742 F.3d 365, 371-72 (8th Cir. 2014) (" '[T]iming alone is insufficient to show a pretextual motive rebutting a legitimate, non-discriminatory reason for an adverse employment action.' . . . [T]he mere

temporal proximity of [the plaintiff's] disclosures to her discharge does not permit the inference that [the employer's] proffered justifications are pretextual." (quoting *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 916 (8th Cir. 2006)). To show that Heritage's proffered justification was pretextual, Sillman must either dispute the factual basis underlying this justification or present evidence that it is more likely that a retaliatory motive led to her termination. *See id.* at 371. "In either case, the plaintiff must point to enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive." *Id.* (quotation omitted).

Sillman argues that an inference of improper motive is supported by the fact that she was "continually criticized but not terminated—and then terminated abruptly only *after* her December 16 complaint," [Doc. # 218 at 57], but this is merely a restatement of her timeline argument. Even Sillman testified that she had received very negative feedback about her job performance and was concerned that she might be terminated before November 23. [Doc. # 213-12 at 13-14]. Sillman was not terminated after making her first written complaint on that date, but rather underwent a performance review that outlined a number of clear expectations regarding her future performance. The formal notice of her termination, issued a month later, stated that she had failed to meet these expectations.

Sillman has not contested this evidence and no reasonable juror could conclude from this evidence that her termination was caused by her complaint. Rather, Sillman was discharged because she did not meet her employer's job expectations after its expectations were made clear during the performance review in November.

23

Significantly, this conclusion is not merely an inference; it is directly supported by and consistent with the uncontroverted evidence in the record.

Sillman has thus failed to present sufficient evidence to permit the inference that Heritage's stated reason for her termination was pretextual or that her discharge was motivated solely by her protected conduct. Accordingly, under either the *McDonnell Douglas* or the dual motive framework, Heritage is entitled to summary judgment on Sillman's claim for FCA retaliation.

### C        Wrongful Discharge

Missouri law recognizes a "very narrowly drawn" public-policy exception to the well-established, at-will employment doctrine. *Frevert v. Ford Motor Co.*, 614 F.3d 466, 470-71 (8th Cir. 2010). This exception provides that "[a]n at-will employee may not be terminated for refusing to perform an illegal act or reporting wrongdoing or violations of law to superiors or third parties." *Margiotta v. Christian Hosp. Ne. Nw.*, 315 S.W.3d 342, 346 (Mo. 2010). An action maintained under this exception "must be based on a constitutional provision, a statute, a regulation based on a statute or a rule promulgated by a governmental body. . . . Absent such explicit authority, the wrongful discharge action fails as a matter of law." *Id.* (citation omitted). To succeed on such a claim, the plaintiff must show both that "he harbored a good-faith belief" that the conduct in question violated the law and public policy and that "this good-faith belief was objectively reasonable." *Bazzi v. Tyco Healthcare Grp., LP*, 652 F.3d 943, 948 (8th Cir. 2011).

#### 1.        *Relator Sillman*

Heritage argues that Sillman's wrongful discharge claim fails as a matter of law because she has not shown how the misconduct she reported prior to her termination violated any law or well-established and clearly mandated public policy. In response to Heritage's motion for summary judgment, Sillman simply references her December 9, 2010 written complaint about Heritage's "fraudulent and illegal behavior." [Doc. # 218 at 59; 218-57 at 1]. In this letter, Sillman identified the following four types of purportedly unlawful practices: (1) fabricating certifications of faculty attendance at in-services; (2) creating "computer forms to replace or to enter 'after the fact' required information for faculty files," specifically back-dating thirty-day faculty evaluations; (3) failing to return unused financial aid funds to students; and (4) failing to fully inform program managers about applicable accreditation standards. [Doc. # 218-57].

Sillman's letter made no reference to any fraudulent grade, attendance, or job placement records and Sillman has made no attempt to show how the misconduct she did complain about violated any law or well-established public policy. Absent such a showing, Sillman's claim for wrongful discharge fails as a matter of law. *See Frevert*, 614 F.3d at 471-72; *Margiotta*, 315 S.W.3d at 346. Consequently, Sillman has failed to present sufficient evidence to establish a submissible claim for wrongful discharge under Missouri law. *See Bazzi*, 652 F.3d at 948.

### 2. Relator Miller

Heritage argues that it is entitled to summary judgment on Miller's claim for wrongful termination because Miller was not terminated and has failed to show that she was constructively discharged. "Constructive discharge occurs when an employer

deliberately renders an employee's working conditions so intolerable that the employee is forced to quit his or her job." *Wallingsford v. City of Maplewood*, 287 S.W.3d 682, 686 (Mo. 2009). These conditions "must be such that a reasonable person would find them intolerable." *Id.* This requires evidence of "more than a single incident; rather, the claim requires proof of a continuous pattern of discriminatory treatment," *id.*, and the plaintiff's evidentiary burden is higher than that which is necessary to prove an adverse employment action, *AuBuchon v. Geithner*, 743 F.3d 638, 645 (8th Cir. 2014) ("[W]e have previously observed that plaintiffs have a higher evidentiary burden to prove a constructive discharge than an adverse employment action.").

Miller's claim for constructive discharge is predicated on the same evidence as her claim for retaliation. As discussed above, this evidence consists primarily of Miller's belief that she had been demoted and would no longer receive Saturday pay. However, the evidence shows that Miller was not formally demoted, received assurances from Beeler that there would be no change in her position, did not receive a reduction in salary, and did not lose any job responsibilities. Although Miller apparently anticipated a demotion and a reduction in pay, there is no evidence that this actually occurred or would have occurred had she not resigned.

Miller's assumptions about what might have occurred had she stayed are not sufficient to show that a reasonable person would have found Miller's working conditions intolerable. *See, e.g.*, *Gamber v. Mo. Dep't of Health & Senior Servs.*, 225 S.W.3d 470, 477 (Mo. Ct. App. 2007) ("Reasonableness requires an employee not to assume the worst, and not to jump to conclusions too fast. . . . There is no constructive discharge

where an employee quits without giving the employer a reasonable chance to work out a problem." (quotations omitted)).  Miller also cites the fact that she was denied a lateral move to another department, but fails to present any argument or authority that suggests the denial of a request for a change in duties can render an employee's working conditions intolerable.  Miller has thus failed to present sufficient evidence to satisfy the higher evidentiary burden that applies to a claim of constructive discharge and Heritage is, accordingly, entitled to summary judgment on this claim.

## III.    Conclusion

For the reasons set forth above, Heritage's motion for summary judgment, [Doc. # 212], is GRANTED.

/s Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: March 31, 2014
Jefferson City, Missouri